## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DASHAAN R. SMITH,                         :        Civil No. 3:24-cv-2196
                                          :
              Plaintiff                   :        (Judge Mariani)
                                          :
      v.                                  :
                                          :
SUPERINTENDENT GOURLEY, *et al.*,         :
                                          :
              Defendants                  :

## MEMORANDUM

Plaintiff Dashaan Smith ("Smith") filed this *pro se* civil rights action pursuant to 42

U.S.C. § 1983. (Doc. 1). In his complaint, Smith names as Defendants: (1) Superintendent

M. Gourley; (2) Deputy Nicklow; (3) Corrections Classification Program Manager ("CCPM")

B. Ritchey; (4) Corrections Classification and Treatment Manager ("CCTM") Newsome; (5)

Major Benner; (6) Unit Manager E. Miller; (7) Corrections Counselor ("CC") Dodson; (8)

Psychological Services Specialist ("PSS") Neal; (9) Sergeant Myers; (10) Correctional

Officer Benning; (11) Sergeant Heidecker; (12) Correctional Officer Jones; (13) Correctional

Officer Crowe; (14) Correctional Officer Iagovino; (15) Correctional Officer Zimmerman; (16)

Correctional Officer Myers; (17) Lieutenant Elwell; (18) Correctional Officer Yok; (19)

Correctional Officer Ressler; (20) Correctional Officer Bare; (21) Correctional Officer

Ebersole; and (22) 10 John Doe individuals. (*Id.* at 2-4).

Presently before the Court is Defendants' motion to dismiss the complaint in part

pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 12). The motion for partial

dismissal is ripe for disposition.  For the reasons set forth below, the Court will grant

Defendants' motion in part and deny it in part, and grant Smith limited leave to amend.

## I.   **Legal Standard**

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6), if it

does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  The

plaintiff must aver "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129

S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic

recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop.*

*Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555).  In other words,

"factual allegations must be enough to raise a right to relief above the speculative level."

*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013)

(internal citations and quotation marks omitted).  A court "take[s] as true all the factual

allegations in the Complaint and the reasonable inferences that can be drawn from those

facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.*

*Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation

marks omitted).

*Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

II.    **Allegations of the Complaint**

At all relevant times, Smith was housed at the State Correctional Institution, Camp

Hill ("SCI-Camp Hill").  (Doc. 1 ¶ 3).  He alleges that Defendants violated a variety of his

constitutional rights, and he also sets forth a claim under the Americans with Disabilities Act

("ADA").  Smith alleges the following facts in support of his claims.

A.    June 12, 2023

On June 27, 2023, Smith was transferred from the State Correctional Institution,

Houtzdale to SCI-Camp Hill and was assigned to the Restricted Housing Unit ("RHU") to

serve a six-month disciplinary custody sentence.  (Doc. 1 ¶ 27).  In October, he was placed

on the Restricted Release List ("RRL").  (*Id.*).  While on RRL, Smith alleges that he began to

hear voices, developed suicidal ideation, "unconscious impulses", suffered severe

depression, anxiety, and paranoia.  (*Id.* ¶ 28).  He alleges that he attempted to obtain

mental health treatment from PSS Neal "but was denied."  (*Id.*).  Smith asserts that he wrote

to Superintendent Gourley "about seeking mental health treatment from a different PSS

because PSS Neal was not helping him." (*Id.*).  Superintendent Gourley allegedly agreed to

arrange for a different PSS to treat Smith.  (*Id.*).  Smith asserts that this never occurred.

(*Id.*).

Smith also alleges that he informed Program Review Committee ("PRC") members—

Nicklow, Ritchey, Newsome, and Benner—that he was mentally ill and was being denied

treatment.  (*Id.* ¶ 29).  Smith asserts that the PRC members only "g[a]ve false promises,

4

such as cutting [Smith's] disciplinary custody (DC) time" and placing him on administrative

custody status so that he could exercise certain privileges, such as using the phone,

ordering food from commissary, and having a television and tablet. (*Id.*). However, Smith

alleges that this never occurred. (*Id.*).

### B.    November 15, 2023

On November 15, 2023, Smith asserts that he began to feel suicidal. (*Id.* ¶ 30). He

alleges that he told Sergeant Myers that he was suicidal when Myers came to collect

Smith's food tray. (*Id.*). Myers ordered Smith to return the tray, but Smith refused. (*Id.*).

Myers allegedly told Smith that he "was going to get the psych" before leaving Smith's

doorway. (*Id.*). Smith claims that Myers never returned. (*Id.*). Smith also claims that he

told Correctional Officer Benning that he was suicidal and threatened to slit his wrists. (*Id.*).

Smith alleges that Benning, who was in the middle of property inventory, responded by

saying, "That's not my job[,] I'm the property officer." (*Id.*). Smith claims that he proceeded

to slit his wrists, and that he was sent to an outside hospital. (*Id.*). He further claims that

"[n]obody came for over an hour." (*Id.*).

### C.    November 28, 2023

On November 28, 2023, Smith was forcefully removed from his cell and placed in a

restraint chair to be moved to cell EA-15. (*Id.* ¶ 31). He alleges that a John Doe officer

used his hands to cover Smith's face, and to cover the spit mask that Smith was already

wearing. (*Id.*). Smith claims that his face was already covered with Oleoresin Capsicum

("OC") spray, making it difficult to breathe. (*Id.*). The John Doe officer allegedly placed Smith on the floor and grabbed Smith's handcuffs and used them to "drag[]" Smith to the cell door, causing pain and numbness in his wrist. (*Id.*). Smith asserts that he suffered nerve damage to his wrist and was required to wear a brace. (*Id.*).

Also on November 28, 2023, a John Doe officer ordered a block worker to "clean out" Smith's cell. (*Id.* ¶ 32). Smith alleges that the block worker removed his legal materials and threw them in the trash and the John Doe officer did not attempt to retrieve Smith's property from the cell. (*Id.*).

D.    December 15, 2023

Correctional Officer Benning allegedly returned Smith's property to him on December 15, 2023. (*Id.* ¶ 33). Smith alleges that his composition books were missing. (*Id.*). Correctional Officer Benning explained that they were confiscated because they were used for gambling, which Smith denies, claiming he had no TV access or other inmates to gamble with, and that he had not been issued an associated misconduct citation. (*Id.*). Smith also alleges that he was missing a set of long john underwear and two books, which Smith claims he had received in July but were "confiscated for no reason, other th[a]n filing grievances and retaliation." (*Id.*).

E.    December 20, 2023 to December 24, 2023

On December 20, 2023, Correctional Officer Ressler allegedly gave Smith a meal tray that was tampered with. (*Id.* ¶ 34). Smith asserts that the tray had old mashed

potatoes on it, which he claims was incorrect because the menu for the day was hot dogs, beans, and macaroni salad. (*Id.* ¶ 34). Smith allegedly told Ressler that the meal was tampered with. (*Id.*). Ressler replied, "'OK', and never came back." (*Id.*). When Ressler returned to collect the tray, Smith refused to return it and demanded to see a lieutenant. (*Id.*).

PSS Neal then came to Smith's cell door. (*Id.*). Smith alleges that he told PSS Neal that he was suicidal, to which she responded, "Stop playing games[,] nothing is wrong with you," and walked away. (*Id.*). Smith then spoke with the lieutenant regarding the tray, who allegedly replied "what the fuck is that." (*Id.*). Smith claims that he skipped this meal and returned the tray. (*Id.*).

On December 21, 2024, Smith alleges that he received a tampered morning tray from Correctional Officer Yok, which contained balled up bread. (*Id.* ¶ 35). Smith refused to eat this meal and showed Yok the balled-up bread on the tray. (*Id.*). Yok allegedly replied that he did not care. (*Id.*). After this morning meal, Smith alleges that he developed "extreme paranoia, and suicidal thoughts" and decided that he would starve himself. (*Id.* ¶ 36). He claims that he did not eat from lunch on December 21, 2023 to December 24, 2023, skipping nine meals. (*Id.*). As a result, Smith alleges that he passed out and a nurse sent him to the infirmary on December 24, 2023. (*Id.*). Smith further alleges that while he was removed from the RHU for medical treatment on December 24, 2023, he should have received treatment sooner, but the John Doe officers had been marking that Smith had

accepted his trays. (*Id.*). He claims that non-Defendant Sergeant Bonilla[1] and non-Defendant Lieutenant Benyo[2] told him that his meals were documented, but that Bonilla knew Smith was refusing meals because he never saw Smith get up to receive his trays. (*Id.*).

F.    December 29, 2023

On December 29, 2023, Sergeant Heidecker allegedly denied Smith access to the law library, "for no reason[.]" (*Id.* ¶ 37). When Smith then claimed to be suicidal, Heidecker allegedly told him to "go ahead and kill yourself" and that Smith had "tried before...and it didn't work, so try again." (*Id.*). A lieutenant spoke to Smith about his suicidal thoughts and told Smith that he would talk to Heidecker if Smith agreed to calm down. (*Id.*).

Heidecker allegedly came back and berated Smith. (*Id.* ¶ 38). Smith again told Heidecker that he was suicidal, and Smith covered his door. (*Id.*). Correctional Officer Bare then approached Smith's cell, Smith informed him that he was suicidal, and Bare stated that "he can[']t do anything." (*Id.*). Smith alleges that he began to scream threats that he was going to kill himself and that "nobody[']s gonna help me." (*Id.*).

Smith claims that Correctional Officer Ebersole was on constant watch with another inmate and failed to do anything. (*Id.*). Smith ultimately placed a towel over his cell door

---

[1]   Smith confirms that Sergeant Bonilla is not a Defendant in this action. (Doc. 18, at 8).

[2]   Smith confirms that Lieutenant Benyo is not a Defendant in this action. (Doc. 18, at 8).

and swallowed a toothbrush "in an attempt to kill himself." (*Id.*). As a result, he was sent to an outside hospital. (*Id.*).

### G.    January 2, 2024

On January 2, 2024, Smith alleges that Correctional Officer Jones taunted him when he was in the Psychiatric Observation Cell ("POC"), stating that since Smith was always in the POC, he could not wait until Smith actually killed himself. (*Id.* ¶ 39). Smith asserts that he covered his cameras "to get someone['s] attention." (*Id.*). Jones allegedly ordered Smith to uncover the cameras. (*Id.*). Smith refused and Jones allegedly stated that he was placing glass over Smith's door so no one would hear him scream, and that he was doing so because he hated black people. (*Id.*). Smith claims that a captain arrived and removed the glass, assuring him that Jones would no longer bother him. (*Id.*).

### H.    March 5, 2024

On March 5, 2024, Correctional Officer Crowe and a John Doe officer allegedly gave Smith a razor even though they purportedly knew he was on razor restriction, urging Smith to kill himself because he was "never getting out of the hole." (*Id.* ¶ 40). Smith asserts that he felt suicidal and spoke with Counselor Dodson regarding his long-term placement in the RHU. (*Id.* ¶ 41). He also alleges that he called for PSS Neal, but that she ignored him and kept walking. (*Id.*). As a result, Smith began to slit his wrist and neck before calling Dodson over so she could witness him swallow a razor. (*Id.*). Smith was subsequently transported to an outside hospital. (*Id.*).

I.     March 22, 2024

On March 22, 2025, Smith alleges that two John Doe officers stood outside his shower "for no reason" and asked to "see what [he] got." (*Id.* ¶ 42). Smith alleges that he started yelling for a lieutenant, who arrived and removed the John Doe officers. (*Id.* ¶ 43). Smith filed a Prison Rape Elimination Act ("PREA") complaint alleging sexual harassment and voyeurism. (*Id.*).

J.     May 13, 2024

On May 13, 2024, Correctional Officer Iagovino allegedly refused to escort Smith to yard because he "[did not] feel like it." (*Id.* ¶ 44). Smith claims that this triggered more suicidal ideation, leading Smith to cover his door. (*Id.*). Correctional Officer Myers was doing rounds and asked Smith if he was ok, to which Smith responded that "his anxiety was going crazy and he needed to go outside," and that he was suicidal. (*Id.*). Myers purportedly told Smith he was going to speak with the lieutenant, but he did not return to Smith's cell. (*Id.*). Smith alleges that Iagovino and Ressler went to his cell and demanded that Smith remove the towel from his window and uncover his door. (*Id.*). Smith asserts that he uncovered his door. (*Id.*).

Smith alleges that he then began to purposefully flood his cell. (*Id.* ¶ 45). Iagovino ordered Smith to stop flooding his cell, and Smith complied. (*Id.*). Smith alleges that Iagovino and another John Doe officer proceeded to spray him with OC spray for no reason,

and that he could not breathe. (*Id.*). Smith maintains that he did not present a threat to himself or others at that point. (*Id.*).

Smith was subsequently removed from his cell and Lieutenant Elwell ordered Smith to be placed in cell ED-13. (*Id.* ¶ 46). Smith protested and claimed that he was suicidal and was supposed to go to the POC instead. (*Id.*). Smith refused to enter the cell, and he had to be transported to cell ED-13 in a wheelchair. (*Id.*). Once inside the cell, Smith alleges that John Doe officers placed him on the ground and stood on him, before picking him up and moving him to another cell, where other prisoners and female officers saw him naked. (*Id.*). Smith was placed in a restraint chair for a few hours. (*Id.*). Smith alleges that he was denied lunch and exercise and suffered numbness in his hands and legs. (*Id.*).

While Smith remained in the restraint chair, Lieutenant Elwell allegedly told Smith that he was to remain in cell ED-13 and not be transferred to the POC, whether he was "suicidal or not". (*Id.* ¶ 47). In response, Smith threatened to bang his head repeatedly off the door, to which Elwell allegedly replied that he "[did not] care." (*Id.*). Smith alleges that John Doe officers placed him in cell ED-13 and Smith began to bang his head off the door, causing pain and swelling. (*Id.* ¶ 48).

Smith alleges that Elwell returned shortly thereafter and ordered Smith to cuff up. (*Id.*). Smith asserts that he told Elwell that he needed to see the psych and go to POC, but he never spoke to the psych. (*Id.*). He further alleges that John Doe officers handcuffed and shackled him for "no reason." (*Id.*). Smith alleges that he turned to the camera and

11

stated that Defendants were denying him mental health treatment, shackling him for no reason, and that "as soon as [they were] done [he was] going to start banging [his] head again." (*Id.*). Smith proceeded to band his head again. (*Id.*). He was then escorted to the POC and placed in a cell that was not cleaned after the previous inmate left the cell. (*Id.*).

Smith remained in shackles until the next day, leaving marks and causing numbness in his hands and ankles. (*Id.* ¶ 49). Smith reported allegations of abuse, excessive force, and PREA claims to Lieutenant Mahal. (*Id.*). Lieutenant Mahal allegedly advised Smith that he did not have to file any grievances regarding these alleged events. (*Id.*).

K.    May 21, 2024

On May 21, 2024, Smith returned to the RHU and was placed in cell ED-13. (*Id.* ¶ 50). Smith alleges that he was only provided a mattress, smock, and smock blanket, and that the cell had no hot water. (*Id.*). While in the cell, John Doe officers allegedly denied Smith meals from May 22, 2024 to May 25, 2024, when he ate breakfast and lunch. (*Id.*). Smith alleges that he became very sick, which led him to use the bathroom over seven times, "and the toilet was broke." (*Id.*). During this time, Smith "was informed he was on a plan of action (POA) meaning he'd have to talk to PRC to receive things." (*Id.*).

L.    May 28, 2024

On May 28, 2024, Smith was relocated to cell EA-13. (*Id.* ¶ 51). John Doe officers allegedly tampered with his food tray. (*Id.*).

Smith also claims that on May 29, 2024, he was transferred to a new cell (cell EA-16) for "no reason." (*Id.*). Smith claims that, through his cell's vents, he was able to speak with two other inmates who also were placed on the Behavioral Management Unit ("BMU"). (*Id.*). He asserts that during this time he discovered 13.8.1 Mental Health Policy § H, which he claims states that inmates on the BMU waiting list should be offered 10 unstructured and 10 structured sessions developing coping skills. (*Id.* ¶ 52).

Smith claims that he was interviewed by Executive Deputy Secretary of Institutional ("EDSI") operations, Micheal Wenerowicz. (*Id.*). Wenerowicz allegedly told Smith that he was sending him to the BMU to receive mental health treatment, but, following his interview, Smith was not given an offer to move to the Diversionary Treatment Unit ("DTU") or participate in its programming. (*Id.*). He alleges that two other white inmates were given this opportunity. (*Id.*).

M.    May 29, 2024

On May 29, 2024, Smith saw the PRC. (*Id.* ¶ 53). During this time, Smith spoke with Deputy Nicklow and told him that he needed access to his legal work because he had appeals of his criminal cases before the Pennsylvania Superior Court, and a filing deadline of June 7, 2024. (*Id.*). Deputy Nicklow allegedly told Smith that he would give him his property, but he never did. (*Id.*). Smith also allegedly told Deputy Nicklow that "he should remain on E-A (DTU)...to receive mental health treatment." (*Id.*). Nicklow replied that "he was going to do that anyway." (*Id.*). However, Smith alleges that "nothing was done and

[he] was moved from E-A 16 cell back to E-D 13 cell" with nothing but a smock and smock blanket. (*Id.*).

Smith claims that he raised the same issues with Superintendent Gourley when Gourley made rounds, and that Gourley stated he would "make sure it gets done." (*Id.*).

### N.    June 5, 2024

On June 5, 2024, Smith saw the PRC and reminded them of his June 7, 2024 legal deadline. (*Id.* ¶ 54). Smith claims that he requested a pen to file grievances but, despite Nicklow's reassurances, he did not receive the pen or his legal property. (*Id.*). Smith asserts that he was provided with a t-shirt, boxers, and socks, and retained his smock and smock blanket. (*Id.*). Smith alleges that he again asked about a transfer to the DTU. (*Id.*). Nicklow purportedly agreed that Smith should be transferred, but no action was taken. (*Id.*).

### O.    June 12, 2024

Smith alleges that he missed his appeal deadline. (*Id.* ¶ 55). On June 12, 2024, Smith saw the PRC and informed Deputy Nicklow that his appeals were now time-barred, and he needed a pen to file grievances covering the issues he alleged to have occurred since May 13, 2024. (*Id.* ¶ 55). Nicklow allegedly replied that he would not give Smith anything, but he was allowed a jumpsuit, a purple crayon, access to the yard and the law library, and was subsequently moved to cell ED-25. (*Id.*). Smith alleges that he was still denied access to grievances. (*Id.*).

During yard time, Smith alleges that he spoke with two inmates regarding their placement on the DTU. (*Id.*). These two inmates allegedly previously asked Nicklow why Smith was not transferred to the DTU, to which Nicklow allegedly replied "whites only." (*Id.*).

P.    June 17, 2024

On June 17, 2924, Correctional Officer Zimmerman and Correctional Officer Myers escorted Smith from the yard. (*Id.* ¶ 56). Zimmerman asked Smith if he needed to go to the law library, to which Smith replied "yes". (*Id.*). Zimmerman and Myers escorted Smith to his cell to pick up items he needed before going to the law library. (*Id.*). As they were leaving the cell, Smith alleges that Correctional Officer Iagovino cornered him in the cell, pushed him up against the wall, and placed his hand inside Smith's underwear and told him that he was going to "show [Smith] a 'PREA.'" (*Id.*). Smith alleges that Zimmerman and Myers witnessed this incident but did nothing. (*Id.*). Smith filed a PREA complaint that night. (*Id.*).

Q.    Claim for Relief

In his complaint, Smith seeks declaratory relief, an injunction ordering Defendants to "uphold and follow DOC policy along with the Federal and State Constitution", and monetary relief exceeding $1.5 million dollars. (*Id.* ¶¶ 57-58).

Defendants now move to dismiss the First Amendment retaliation claims, Eighth Amendment deliberate indifference and excessive force claims, ADA claim, harassment claim, and the claim for injunctive relief. (Doc. 17). Defendants further argue that if the

claims survive their motion to dismiss, they are improperly joined and must be severed. (*Id.*).

## III.  **Discussion**

### A.    First Amendment Retaliation Claims

To plead a prima facie First Amendment retaliation claim, a plaintiff must allege that: "(1) [their] conduct was constitutionally protected; (2) [they] suffered an adverse action at the hands of prison officials; and (3) [their] constitutionally protected conduct was a substantial or motivating factor in the decision to [retaliate against them]." *Watson v. Rozum,* 834 F.3d 417, 422 (3d Cir. 2016) (citations omitted). As for the first element of a plaintiff's prima facie retaliation claim, examples of constitutionally protected activities are the filing of lawsuits and prison grievances. *Id.* (reiterating prior holding that a prisoner-plaintiff engages in constitutionally protected activity when they file a grievance against a prison official); *Allah v. Seiverling*, 229 F.3d 220, 223-25 (3d Cir. 2000) (concluding that the prisoner-plaintiff stated a First Amendment retaliation claim where he alleged that he had been kept in administrative segregation in retaliation for filing civil rights claims against prison officials).

Regarding the second element of a plaintiff's prima facie case, an adverse action is one that is "sufficient to deter a person of ordinary firmness from exercising [their] [constitutional] rights[.]" *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (second alteration in original) (citations and internal quotation marks omitted); *Fantone v. Latini*, 780

F.3d 184, 191 (3d Cir. 2015), *as amended* (Mar. 24, 2015) (explaining that an adverse

action must be "sufficient to deter a person of ordinary firmness from exercising [their]

constitutional rights…" (citation omitted)).  However, to be actionable under Section 1983,

the alleged adverse action must be more than *de minimis*.  *See McKee v. Hart*, 436 F.3d

165, 170 (3d Cir. 2006) (explaining that the alleged retaliatory conduct "need not be great in

order to be actionable, but it must be more than *de minimis*" (citations and internal quotation

marks omitted)).

Finally, with respect to the third element of a plaintiff's prima facie case, i.e., the

causation element, the Court observes that, "[b]ecause motivation is almost never subject to

proof by direct evidence," a plaintiff must typically "rely on circumstantial evidence to prove

a retaliatory motive."  *Watson*, 834 F.3d at 422.  The plaintiff "can satisfy [their] burden with

evidence of either (1) an unusually suggestive temporal proximity between the protected

activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with

timing that suggests a causal link."  *Id.* (footnote omitted).  "In the absence of that proof the

plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of

the fact should infer causation."  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259,

267 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.

2000)); *see also Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (pointing out

that circumstantial evidence may include "inconsistent reasons given by the employer for

terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole"), *as amended* (Aug. 28, 2007).

### 1.    Retaliation Claim Against Benning

Smith alleges that Defendant Benning retaliated against him for filing grievances against other officers.  (Doc. 1 ¶¶ 30, 33; Doc. 18, at 2-3).  He alleges that Defendant Benning retaliated by confiscating his long johns, composition books, and two other books.  (Doc. 1 ¶ 33).  Defendants argue that Smith has not plausibly alleged causation with respect to his retaliation claim against Benning.  (Doc. 17, at 28-29).  They maintain that, while Smith alleges that he filed grievances, he does not identify any grievances that he filed against Defendant Benning.  (*Id.*).

It is well-settled that causation cannot be inferred simply by asserting that a plaintiff pursued some protected activity (such as a prison grievance) against a Defendant who is not the alleged perpetrator of the retaliatory adverse action.  *See, e.g.*, *Nunez v. Wetzel*, No. 1:21-cv-01484, 2023 WL 2385931, at *5 (M.D. Pa. Mar. 6, 2023) (collecting cases); *Kendrick v. Hann*, No. 1:19-cv-01642, 2021 WL 2914986, at *9 (M.D. Pa. July 12, 2021); *Victor v. Lawler*, No. 3:07-cv-2058, 2010 WL 5014555, at *5 (M.D. Pa. Dec. 3 2010); *Evans v. Rozum*, No. 07-cv-230J, 2009 WL 5064490, at *22 (W.D. Pa. Dec. 17, 2009) ("[T]here is no apparent reason why [the moving defendants] would want to retaliate against Plaintiff for filing a lawsuit against others." (second alteration in original)); *Royster v. Beard*, No. 1:06-cv-0842, 2008 WL 2914516, at *6 (M.D. Pa. July 24, 2008) (concluding that plaintiff failed to

18

satisfy the causal connection for his retaliation claim against defendant because previous grievance did not name or impact that defendant), *aff'd* 308 F. App'x 576 (3d Cir. 2009) (nonprecedential). Such general allegations fail to establish or even infer knowledge of the protected conduct, and they likewise fail to show why a defendant would take the alleged adverse action. Smith's complaint lacks any causal connection between his protected conduct and Defendant Benning.

Moreover, in his brief in opposition to Defendants' motion to dismiss, Smith acknowledges that he did not file a grievance against Benning. (Doc. 18, at 2-3). Smith "believed in his complaint [that] he showed [retaliation]" because "he filed grievances against Sgt. Myers, and multiple CO[]s." (Doc. 18, at 3; Doc. 18-1, Grievance Number 1064677). Because Smith filed grievance number 1064677 on December 7, 2023, and Defendant Benning confiscated his property on December 15, 2023, Smith believes he "has show[n] causation." (Doc. 18-1, at 3). However, Smith has failed to allege that the previous grievance was lodged against Defendant Benning—in fact, he acknowledges that the grievance was not filed against Defendant Benning. (*Id.*). Therefore, Smith has failed to plead the third element of a retaliation claim against Defendant Benning and this claim will be dismissed without leave to amend.

### 2.    Retaliation Claim Against Ressler and Yok

Smith alleges that Defendants Ressler and Yok retaliated against him by denying him medical attention and treatment. (Doc. 1 ¶¶ 34-36; Doc. 18, at 3-4). Smith thus

contends that he suffered an adverse action because he was denied adequate medical care. (Doc. 18, at 3-4). The denial of medical care can constitute adverse action for First Amendment purposes. *See Thomas v. Brinich*, 2014 WL 956983, at *5 (M.D. Pa. 2014) (finding that "[a] delay in providing, or denial of, medical treatment constitutes adverse action for purposes of a retaliation claim"). Smith has satisfied the second factor of a retaliation claim with respect to Defendants Ressler and Yok.

However, Smith has not met his burden with respect to the first and third factors because he does not allege that he engaged in constitutionally protected conduct and does not allege the constitutionally protected conduct was a substantial or motivating factor for the adverse action.

Based on Smith's failure to properly plead the first and third elements of a retaliation claim, his First Amendment claim against Defendants Ressler and Yok will be dismissed without prejudice and with leave to amend.

     B.   Eighth *Amendment Claims*

         **1.**   **Eighth Amendment Claims Against Iagovino and Ebersole**

Smith concedes that the following claims can be dismissed: the conditions of confinement claim against Iagovino related to May 13, 2024, and the deliberate indifference to serious medical need claim against Ebersole related to December 29, 2024. (Doc. 18, at 8, 11). Because Smith agrees to dismissal of these claims, the Court will dismiss these claims without a merits analysis. *See Benedict v. Sw. Pennsylvania Hum. Servs.*, Inc., 98

20

F. Supp. 3d 809, 814 (W.D. Pa. 2015) (dismissing some claims when plaintiff's partial brief in opposition conceded failure to state a claim).

### 2.    Inadequate Medical/Mental Health Care Claims

To state an Eighth Amendment inadequate medical care claim, "a prisoner must make (1) an 'objective' showing that the prisoner's medical needs were sufficiently serious and (2) a 'subjective' showing that the prison official acted with a sufficiently culpable state of mind." *Mitchell v. Gershen*, 466 F. App'x 84, 86 (3d Cir. 2011) (citing *Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002)).  "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A medical need is serious if it has been diagnosed by a physician as requiring treatment or so obvious that a lay person would easily recognize the necessity for a doctor's attention.  *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).  Deliberate indifference occurs when a prison official knows of and disregards an excessive risk to a prisoner's health.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  However, prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients.  *Young v. Kazmerski*, 266 F. App'x 191, 194 (3d Cir. 2008).  Mere negligence in diagnosing or treating a medical condition does not state a valid claim under the Eighth Amendment.  *Estelle*, 429

U.S. at 105-06. Disagreement as to proper care also does not support a finding of deliberate indifference. *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990).

          a.    <u>Defendant Neal</u>

Smith alleges that when he was placed on RRL in October 2023, he began to hear voices, developed suicidal ideation, "unconscious impulses", suffered severe depression, anxiety, and paranoia. (Doc. ¶¶ 27-28). He alleges that he attempted to obtain mental health treatment from Defendant Neal but was denied. (Id. ¶ 28).
In December 2023, Smith alleges that he told Defendant Neal that he was suicidal. (Id. ¶ 34). Defendant Neal allegedly responded, "Stop playing games[,] nothing is wrong with you," and walked away. (Id.).

In March 2024, Smith alleges that he felt suicidal and "called for PSS Neal to talk to her because she was the psych. PSS Neal looked at [Smith] and kept walking. That's when [Smith] began cutting his wrist, and neck." (*Id.* ¶ 41).

Liberally construed, Smith's complaint alleges that he is an inmate known to have a mental illness and that Defendant Neal, a Psychological Services Specialist, failed to provide meaningful mental health treatment. The Court concludes that Smith has set forth a plausible deliberate indifference claim against Defendant Neal at this juncture.

          b.    <u>Defendants Gourley and PRC Members (Nicklow, Ritchey, Newsome, and Benner)</u>

Smith alleges that he wrote to Superintendent Gourley "seeking mental health treatment from a different PSS because PSS Neal was not helping him." (Doc. 1 ¶ 28).

22

Gourley allegedly responded that he would arrange for a different PSS to treat Smith, but Smith alleges this never occurred. (*Id.*).

Smith also alleges that he "expressed his mental health struggles" and was "denied treatment" by "PRC Members[,] Deputy Nicklow, CCPM B. Ritchey, [ ] CCTM Newsome, and Major Benner." (*Id.* ¶ 29).

Smith alleges that he had a personal interaction with Defendants Gourley, Nicklow, Ritchey, Newsome, and Benner, and that they knew that Smith required mental health programing and treatment but failed to assist him. (*See id.*; *see also* Doc. 18, at 5-6; Doc. 18-2).

At this stage of the litigation, the Court must view the allegations of the complaint as true and draw all reasonable inferences in Smith's favor. Thus, his allegations against Defendants Gourley, Nicklow, Ritchey, Newsome, and Benner state a plausible Eighth Amendment claim based on the alleged denial of adequate mental health treatment.

c.    <u>Defendant Myers</u>

Smith alleges that he spoke with Defendant Myers on two separate occasions (November 15, 2023 and May 13, 2024) regarding his suicidal thoughts. (Doc. 1 ¶¶ 30, 44). On November 15, 2023, Smith alleges that he told Defendant Myers that he was "suicidal and wanted to die." (*Id.* ¶ 30). In response, Defendant Myers asked for Smith's lunch tray and Smith refused. (*Id.*). Myers then stated that "'[he] was going to get the psych' and left

[Smith's] door and never came back." (*Id.*).  Smith alleges that he subsequently cut his wrist and was sent to an outside hospital.  (*Id.*).

On May 13, 2024, Smith asserts that he attempted to sign up for yard, but Defendant Iagovino rejected his request.  (*Id.* ¶ 44).  Smith alleges that he covered his door and began to have suicidal thoughts.  (*Id.*).  Defendant Myers was on rounds and asked if Smith was ok.  (*Id.*).  Smith told Myers that "his anxiety was going crazy and he needed to go outside, [and that] he also was having suicidal thoughts."  (*Id.*).  Defendant Myers advised Smith that he was going to talk to Defendant Elwell, but he never returned.  (*Id.*).

Based on the allegations of the complaint, Smith identifies two instances where he informed Myers that he was suffering a mental health crisis, and Myers allegedly "never returned[,]" (Doc. 1 ¶¶ 30, 44), that in turn resulted in a substantial risk of serious harm to Smith's health and safety.  The Eighth Amendment inadequate medical/mental health care claim may proceed against Myers.

### d.    Defendants *Iagovino* and Ressler

Also on May 13, 2024, Smith alleges that, after Defendant Myers failed to return to his cell, Defendants Iagovino and Ressler came to his cell and "told him to take his tow[el] off his window and uncover his door." (Doc. 1 ¶ 44; Doc 18, at 9).  Smith uncovered his door and informed Defendants Iagovino and Ressler that he was suicidal.  (Doc. 1 ¶ 44).  At that point, Smith alleges that he began to flood his cell.  (*Id.* ¶ 45).  Nowhere in the complaint does Smith allege that Defendants Iagovino and Ressler denied a request for

medical assistance.  Smith has failed to state a claim against Defendants Iagovino and Ressler for a violation of the Eighth Amendment.  This claim will be dismissed without prejudice.

### 3.    Excessive Force Claim Against Elwell

Where a prison official is alleged to have used excessive force in violation of the Eighth Amendment, the pertinent inquiry for the subjective element is "whether [the] force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 231 (3d Cir. 2015) (explaining that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated[,]" and "[t]his is true whether or not significant injury is evident").  In conducting this inquiry, there are several factors that a court must consider in determining whether a prison official has used excessive force against a prisoner, including:

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."

*Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

As for the objective element, the pertinent inquiry is whether the prison official's actions were "harmful enough," *Hudson*, 503 U.S. at 8, or "sufficiently serious," *Wilson v.*

*Seiter*, 501 U.S. 294, 298 (1991). "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (citation omitted). As a result, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327). Instead, the Eighth Amendment prohibits the use of force that offends "contemporary standards of decency[,]" regardless of whether "significant injury is evident[;]" although, the extent of injury may provide "some indication of the amount of force applied" or "whether the use of force could plausibly have been thought necessary in a particular situation." *Wilkins*, 559 U.S. at 37 (citation, internal citation, and internal quotation marks omitted).

Smith alleges that, on May 13, 2024, he began flooding his cell. (Doc. 1 ¶¶ 44-45). Defendant Iagovino allegedly ordered Smith to stop flooding his cell, and Smith complied. (*Id.*). Smith alleges that Defendant Iagovino and a John Doe officer then deployed OC spray "for no reason[.]" (*Id.*). Smith was removed from his cell and Defendant Elwell ordered Smith to be placed in cell ED-13. (*Id.* ¶ 46). Smith alleges that he told Elwell that he was suicidal and requested to be placed in a POC cell. (*Id.*). Smith was then placed in a wheelchair and transported to cell ED-13. (*Id.*). Smith refused to enter cell ED-13, claiming that Elwell and officers were going to retaliate against him. (*Id.*). Once inside the cell, Smith was placed on the ground and John Doe officers stood on him. (*Id.*). He alleges that

the John Doe officers picked him up and carried him naked from cell ED-13 to cell ED-12. (*Id.*).  Smith was then placed in a restraint chair "for a few hours."  (*Id.*).  He alleges that he "failed to receive his lunch tray, and exercise, and was never asked.  [And his] hands, and legs started to become numb."  (*Id.*).

Defendant Elwell allegedly told Smith that he was going into cell ED-13, not the POC, "to face his punishment[,]" whether Smith was suicidal or not.  (*Id.* ¶ 47).  Smith then threatened to bang his head repeatedly against the cell door.  (*Id.* ¶ 47).  John Doe officers placed Smith in cell ED-13, and he began to bang his head off the door.  (*Id.* ¶ 48). Defendant Elwell then ordered Smith to cuff up, and John Doe officers placed Smith in handcuffs and shackles "for no reason."  (*Id.*).  Smith was then transported to the POC. (*Id.*).  Smith alleges that he remained in handcuffs and shackles until the next day, and his hands and ankles went numb.  (*Id.* ¶ 49).

With respect to Defendant Elwell, Smith alleges that he used excessive force by ordering a restraint chair and handcuffing and shackling him.  (*Id.* ¶¶ 46-49).  Accepting Smith's allegations as true, which the Court is required to do in connection with its resolution of a Rule 12(b)(6) motion to dismiss, the Court concludes that the complaint alleges facts sufficient to state an excessive use of force claim against Defendant Elwell.  A developed factual record is necessary to determine whether Defendant Elwell's use of force was objectively unreasonable under the circumstances.  Thus, the Court finds that the complaint

plausibly states an excessive use of force claim against Defendant Elwell. As such, the Court will deny Defendants' motion to dismiss the excessive force claim against Elwell.

C.      Americans with Disabilities Act and Rehabilitation Act Claims

Smith sets forth an official capacity claim under Title II of the Americans with Disabilities Act ("ADA"). (Doc. 1 ¶¶ 26, 58-59). The Court also construes that complaint as raising an official capacity claim under Section 504 of the Rehabilitation Act of 1973 ("RA").[3] Defendants move to dismiss the ADA claim. (Doc. 17, at 44-48). Smith does not oppose dismissal of the ADA claim. (*See* Doc. 18).

One of the purposes of the RA is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society..." 29 U.S.C. § 701(b)(1). As for the ADA, it "embodies a 'national mandate for the elimination of discrimination against individuals with disabilities[,]' 42 U.S.C. § 12101(b)(1)[, which is] performed across 'three titles of regulation—Title I (employers), Title II (governments), and Title III (public accommodations).'" *Zangara v. Nat'l Bd. of Med. Examiners*, Nos. 24-2664, 24-2672, 2025 WL 1218188, at \*4 (3d Cir. Apr. 28, 2025) (unpublished) (quoting *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 176 (3d Cir. 2019)).

Title II of the ADA and Section 504 of the RA provide similar protections. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such

---

[3]     The Court construes Smith's complaint as asserting official capacity claims under Section 504 of the Rehabilitation Act of 1973 ("RA") and Title II of the Americans with Disabilities Act ("ADA") and presumes that Smith may assert official capacity claims under Title II and Section 504 for monetary damages against Defendants.

disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132(1). Section 504 states that "[n]o otherwise qualified individual

with a disability...shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subject to discrimination under any program

or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

     In addition to providing similar protections, Title II and Section 504 require

substantially similar factual allegations to state plausible claims for relief. Under both

statutes, plaintiffs must allege that "(1) they are qualified individuals; (2) with a disability; and

(3) they were excluded from participation in or denied the benefits of the services,

programs, or activities of a public entity, or were subjected to discrimination by any such

entity; (4) by reason of their disability." *Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023)

(citing *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018)). Also, "[w]here compensatory

damages are sought, a plaintiff must also show intentional discrimination under a deliberate

indifference standard." *Id.* (citing *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir.

2019)); *see also D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 270 (3d Cir. 2014)

(requiring plaintiff seeking to establish deliberate indifference to show "(1) [actual]

*knowledge* that a federally protected right is substantially likely to be violated...and (2)

*failure to act* despite that [actual] knowledge" (quoting *S.H. ex rel. Durrell v. Lower Merion*

*Sch. Dist.,* 729 F.3d 248, 265 (3d Cir. 2013))).

"Congress has directed the courts to construe the ADA and the [RA] such that conflicting standards do not arise." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007) (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)); *see also S.H. ex rel. Durrell*, 729 F.3d at 260 ("The same standards govern both the RA and the ADA claims."). Nevertheless, "the ADA and the [RA] are not exactly the same." *Id.* For instance, under Section 504, a plaintiff must also allege that "the program in question received federal dollars." *Durham*, 82 F.4th at 225 (citing 29 U.S.C. § 794 and *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021)); *see also Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 279 (3d Cir. 1996) (explaining that the ADA "extends the nondiscrimination rule of Section 504 of the [RA] to services provided by any 'public entity' without regard to whether the entity is a recipient of federal funds").

Additionally, the causation elements of Section 504 and Title II differ. *See Durham*, 82 F.4th at 226. Section 504 requires a plaintiff to establish that "the disability [was] the sole cause of the discriminatory action." *Id.* (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235-36 & n.11 (3d Cir. 2013)); *see also* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability…shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" (emphasis added)). Thus, "[a]n alternative cause of why a plaintiff was treated differently is fatal to a claim under the [RA] 'because disability would no longer be the sole cause.'" *See Lewald v. Pa. Dep't of Corr.*,

No. 22-cv-04625, 2025 WL 1568286, at *3 (E.D. Pa. June 3, 2025) (quoting *CG*, 734 F.3d at 236 n.11). On the other hand, Title II "only requires but-for causation," *Durham*, 82 F.4th at 226 (citing *CG*, 734 F.3d at 235-36 & n.11), i.e., that the plaintiff establish that the discriminatory action was "by reason of [the plaintiff's] disability." 42 U.S.C. § 12132.

The allegations of Smith's complaint fail to allege a plausible Section 504 or Title II official capacity claim against Defendants. The Court presumes that Smith has sufficiently alleged that he is a qualified individual with a disability due to his mental health condition, satisfying the first element of a Title II and Section 504 discrimination claim.

The second element requires an allegation of a program, service, or activity from which Smith was excluded. Smith alleges that Defendant Neal denied him mental health treatment. (Doc. 1 ¶ 28). He further alleges that Defendants Nicklow, Ritchey, Newsome, and Benner made "false promises, such as cutting [Smith's] disciplinary custody (DC) time and turn him Administrative Custody (AC), where [Smith] would be able to use the phone, order food from commissary, and have a TV, and tablet, and earn more privileges." (*Id.* ¶ 29). However, nowhere in the complaint does Smith allege that Defendants discriminated against him on the basis of his disability in violation of the ADA, or that Defendants discriminated against him on the basis of his disability in violation of Section 504. He failed to plausibly allege facts that he was excluded from or denied any services solely or in part because of his disability. Smith's complaint only references the ADA in his claim for relief. (Doc. 1 ¶¶ 58-59). Conclusory allegations of discrimination, and the failure to

accommodate, are insufficient to establish the causation necessary to support a claim that Defendants failed to act solely because of his mental health disability and by reason of his disability. *See, e.g., Alvarez v. City of Phila.*, No. 23-cv-03570, 2023 WL 6520507, at *3 (E.D. Pa. Oct. 4, 2023) (dismissing ADA claim for failure to accommodate where plaintiff alleged only in conclusory fashion that her employer failed to provide reasonable accommodations for her disability); *Elbert v. N.Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) ("[C]ourts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability.").

The Court further notes that any attempt to assert ADA liability due to what Smith deems to be inadequate medical treatment is foreclosed, as a claim of denial of medical treatment for his mental disability is not cognizable under the ADA. *See Iseley v. Beard*, 200 F. App'x 137, 142 (3d Cir. 2006) (unpublished) ("Iseley does not claim that he was excluded from any program on the basis of his disability. Rather he claims that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions." (citation omitted)).

Smith has failed to state plausible claims for relief under either Title II of the ADA or Section 504 of the RA against Defendants in their official capacities. These claims will be dismissed without prejudice and with leave to amend.

D.    Harassment Claim Against Jones

Defendants argue that the harassment claim against Correctional Officer Jones must be dismissed because there is no state tort claim of harassment.   (Doc. 17, at 48). However, the Court construes Smith's claim against Defendant Jones as verbal harassment under the Eighth Amendment.[4]  (Doc. 1 ¶¶ 37, 58).  Even so, the Court finds that Smith's Eighth Amendment verbal harassment claim against Jones fails.

According to Smith's complaint, Correctional Officer Jones "taunted" Smith on January 2, 2024 when he was in the POC and stated that "[he could not] wait until [Smith] really killed [himself]." (Doc. 1 ¶ 39).  He further alleges that Jones placed glass over Smith's door and stated that he "hate[d] black people." (*Id.*).  Smith thus alleges that Defendant Jones verbally harassed him on one occasion. (*See id.*).  "It is well settled that verbal harassment of a prisoner, although deplorable, does not violate the Eighth Amendment." *Robinson v. Taylor*, 204 F. App'x 155, 156 (3d Cir. 2019).  Therefore, a claim against Jones based upon verbal harassment does not violate the Eighth Amendment and must be dismissed.  *See Washington v. Rozich*, 734 F. App'x 798, 801 (3d Cir. 2018)

---

[4]    Although Smith seeks an order directing Defendants to "follow...the Federal and State Constitution[,]" he does not appear to set forth a state law claim of harassment.  (*See* Doc. 1 ¶¶ 57-59); (*see also* Doc. 18, at 11) (setting forth an argument in support of an Eighth Amendment harassment claim).  Nevertheless, the Court acknowledges that a claim of harassment is not recognized as an independent civil cause of action in Pennsylvania. *See Scutella v. Cousins*, 2016 WL 8677254, at *3 (W.D. Pa. Aug. 19, 2016) (citing *Keahey v. Bethel Township*, 2012 WL 478936, at *12 (E.D. Pa. 2012) (citing *Sobel v. Winguard*, 531 A.2d 520, 522-23 (Pa. Super. 1987))), *report and recommendation adopted*, 2016 WL 5402718 (W.D. Pa. Sept. 28, 2016). *See also DeAngelo v. Fortney*, 357 Pa. Super. 127, 132 (Pa. Super. 1986) ("Pennsylvania courts have not heretofore recognized a separate tort of harassment.  We decline to do so in the instant case...").

("Verbal harassment of a prisoner, although distasteful, does not violate the Eighth Amendment.") (citations omitted).

E.    Claim for Injunctive Relief

At all relevant times, Smith was housed at SCI-Camp Hill. (Doc. 1 ¶ 27). He seeks declaratory and injunctive relief in this matter. (Id. ¶ 57). However, Smith is no longer housed at SCI-Camp Hill.[5] Article III of the Constitution provides that the judicial power of the United States shall extend to "cases" and "controversies." U.S. CONST., art. III, § 2. "[F]ederal courts may adjudicate only actual, ongoing cases or controversies," Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990), and "[i]t is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed,'" United States v. Juvenile Male, 564 U.S. 932, 936 (2011) (citation omitted). Generally, an inmate's transfer from the facility complained of moots claims for equitable and declaratory relief. Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003); Johnson v. Wenerowicz, 440 F. App'x 60, 62 (3d Cir. 2011) (holding that the prisoner's request for injunctive and declaratory relief against the named defendants was rendered moot by his transfer to another prison). Because Smith is no longer incarcerated at SCI-Camp Hill, he does not present a live case or controversy for injunctive or declaratory relief regarding the policies or practices at that facility.

---

[5]    Smith is presently housed at the State Correctional Institution, Benner Township. See DEPARTMENT OF CORRECTIONS' INMATE LOCATOR, https://inmatelocator.cor.pa.gov/#/ (searching Inmate Number MM3285) (last visited Jan. 31, 2026).

F.    Joiner

Rules 18 and 20 of the Federal Rules of Civil Procedure explain the circumstances in which multiple claims and multiple defendants may be joined.  Rule 18 states that a party "may join…as many claims as it has against an opposing party."  FED. R. CIV. P. 18(a). Thus, when an action involves only one defendant, a plaintiff may assert every claim he has against that defendant, regardless of whether the claims are factually or legally related to one another, subject only to the limits of federal subject-matter jurisdiction.  *See* 7 CHARLES ALAN WRIGHT & ARTHUR MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 1655 (3d ed. 2019); *see also* FED. R. CIV. P. 18(a).

When a plaintiff seeks to assert claims against multiple defendants, however, Rule 20 also comes into play.  *See* WRIGHT & MILLER, *supra*, § 1655.  Rule 20 governs permissive joinder of parties and explains that a plaintiff may only join multiple defendants in a single case if (1) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," and (2) "any question of law or fact common to all defendants will arise in the action."  FED. R. CIV. P. 20(a)(2).  In other words, a plaintiff may join multiple defendants in a single complaint only if he asserts at least one claim linking all defendants that (1) arises out of the same transaction or occurrence and (2) involves a common question of law or fact.  *Id.*; WRIGHT & MILLER, *supra*, § 1655.  That is, there must be at least one common claim against all named defendants.  Once a plaintiff satisfies this requirement, he may

invoke Rule 18 to assert "as many claims as [he] has" against one or more defendants,

even if those additional claims are unrelated to the common claim linking all defendants.

*See* FED. R. CIV. P. 18(a); WRIGHT & MILLER, *supra*, § 1655.

To remedy a misjoinder, a court may add or drop a party or sever any claims.  FED.

R. CIV. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop

a party.  The court may also sever any claim against a party").

Defendants maintain that Smith's complaint violates Rule 20.  (Doc. 17, at 49-50).

More specifically, Defendants argue that the claims in the complaint occurred from June 27,

2023 to June 17, 2024, and pertain to over approximately 20 different incidents.  (*Id.*).

Defendants assert that, to the extent any claims survive the motion to dismiss, they must be

severed.  (*Id.*).

Upon review of Smith's complaint, the Court concludes that it does not violate Rule

20.  Smith alleges a sequence of events that occurred at SCI-Camp Hill when he was

housed in the RHU.  Although Smith's claims address a wide variety of purported

wrongdoing over several months, there is a comprehensible theory linking all of these

claims that permits joinder under Rule 20.  The Court, therefore, declines to grant

Defendants' motion to dismiss on this basis.

## IV.    Leave to Amend

Before dismissing a complaint for failure to state a claim upon which relief may be

granted, the Court must grant the plaintiff leave to amend the complaint unless amendment

would be inequitable or futile. *See Grayson v. Mayview State Hospital*, 293 F.3d 103, 114

(3d Cir. 2002). "In assessing 'futility,' the district court applies the same standard of legal

sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114

F.3d 1410, 1434 (3d Cir. 1997) (citation omitted).

Smith's retaliation claim against Correctional Officer Benning, and his verbal

harassment claim against Correctional Officer Jones are legally flawed and thus incurable.

Therefore, the Court concludes that curative amendment would be futile.

However, Smith will be granted leave to amend his retaliation claim against

Correctional Officer Ressler and Correctional Officer Yok, his deliberate indifference claim

against Correctional Officer Iagovino and Correctional Officer Ressler, and his Title II and

Section 504 official capacity claims against Defendants.

## V.    Conclusion

For the reasons stated above, Defendants' motion for partial dismissal will be granted in part and denied in part.  (Doc. 12).  The motion to dismiss the deliberate indifference claim against Neal, Gourley, Nicklow, Ritchey, Newsome, and Benner, and the excessive force claim against Defendant Elwell will be denied.  The Court will also deny Defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 20.

The motion to dismiss will be granted in all other respects, in accordance with this Memorandum.

A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: February ___, 2026